UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TWIN BRIDGES WASTE AND RECYCLING, LLC,

*Plaintiff*,

-*against*-

COUNTY WASTE AND RECYCLING SERVICE,
INC., ROBERT WRIGHT DISPOSAL, INC., WASTE
CONNECTIONS US, INC., and WASTE
CONNECTIONS, INC. d/b/a "WASTE
CONNECTIONS,"

*Defendants*.

Case No.: 1:21-cv-00263
(DNH/DJS)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

NIXON PEABODY LLP

William E. Reynolds (Bar No. 512175)
Gordon L. Lang (Bar No. 509321)
Andrew C. Rose (Bar No. 102473)
Erin T. Huntington (Bar No. 702540)
677 Broadway, 10th Floor
Albany, NY 12207
Tel: (518) 427-2687
Fax: (855) 897-1993
wreynolds@nixonpeabody.com
glang@nixonpeabody.com
acrose@nixonpeabody.com
ehuntington@nixonpeabody.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    THE LEGAL STANDARD ................................................................................. 2

III.    ALL THREE CLAIMS MUST BE DISMISSED BECAUSE TWIN BRIDGES DOES NOT ALLEGE THAT DEFENDANTS HAVE SUFFICIENT MARKET POWER TO HAVE A DANGEROUS PROBABILITY OF ACHIEVING A MONOPOLY ..................................................................................................... 3

IV.    THE COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS  TO ESTABLISH DEFENDANTS' PRICES ARE PREDATORY (COUNT I). ..................... 5

V.    COUNT II MUST BE DISMISSED BECAUSE IT DOES NOT ALLEGE THAT THE CONTRACTS OF WHICH IT COMPLAINS HAVE CAUSED SUBSTANTIAL FORECLOSURE IN THE MARKET AND ITS OTHER ALLEGATIONS ARE INFIRM ................................................................................. 9

    A.    There is no valid allegation that the customer contracts foreclosed any substantial share of the market .................................................................. 9

    B.    The Tortious Interference and Other Business Tort Allegations Do  Not Support the Claim ................................................................................ 11

VI.    THE REFUSAL TO DEAL CLAIM (COUNT III) MUST BE DISMISSED BECAUSE DEFENDANTS HAD NO OBLIGATION TO PROVIDE DISPOSAL SERVICES TO TWIN BRIDGES ................................................. 14

VII.    THE COURT LACKS PERSONAL JURISDICTION OVER WCI AND WCUSI. ....... 16

    A.    Jurisdictional Facts ................................................................................. 16

    B.    The Relevant Federal Statute (Clayton Act Section 12) Does Not Authorize Personal Jurisdiction Over WCI or WCUSI ....................... 17

        1.    Neither WCI Nor WCUSI Is an Inhabitant of the Northern District of New York ............................................................................... 18

        2.    Neither WCI Nor WCUSI Is Found in the NDNY .................................. 18

        3.    Neither WCI Nor WCUSI Transacts Business in the NDNY .................. 19

        4.    WCUSI's Administrative Services for Its Subsidiaries Do Not Provide any Basis for Jurisdiction ......................................................... 20

    C.    The New York State Jurisdictional Statutes (CPLR §§ 301-302) Provide No Basis for Personal Jurisdiction over WCI or WCUSI ................................... 22

        1.    There Is No General Jurisdiction Under CPLR § 301 Because County Waste and Robert Wright Are Not "Mere Departments" of WCI or WCUSI ................................................................................. 22

        2.    There Is No Specific Jurisdiction Under CPLR § 302 ............................. 23

    D.    Subjecting WCI and WCUSI to Jurisdiction Would Violate Due Process ........... 24

VIII.    CONCLUSION ................................................................................................ 25

**Federal Cases**

*AD/SAT, a Division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999).............................................................................................3

*Affinity LLC v. GfK Mediamark Research & Intelligence, LLC*,
547 Fed. Appx. 54, 56 (2d Cir. 2013) ....................................................5, 8, 12, 13

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
596 F. Supp. 2d 630 (E.D.N.Y. 2009) .............................................................19, 20

*American Lecithin Co. v. Rebmann*,
2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017)........................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................2, 10

*Astra Media Group, LLC v. Clear Channel Taxi Media, LLC*,
414 Fed. Appx. 334 (2d Cir. 2011)...........................................................................7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................2, 10, 13

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...............................................................................................5, 11

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) .................................................................................20

*Cardenas v. McLane FoodService, Inc.*,
2010 WL 11465450 (C.D. Cal. Oct. 25, 2010).......................................................21

*Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express
World Corp.*,
230 F.3d 934 (7th Cir. 2000) ...................................................................................21

*Charles Schwab Corp. v. Bank of America Corp.*,
883 F.3d 68 (2d Cir. 2018)........................................................................................19

*Crossword Magazine, Inc. v. Times Books*,
1997 WL 227998 (E.D.N.Y. May 5, 1997) ..............................................................5

*Daniel v. American Board of Emergency Medicine*,
428 F.3d 408 (2d Cir. 2005)................................................................................18, 19

*Dennis v. JPMorgan Chase & Co.,*
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) ...................................................................19

*ESI, Inc. v. Coastal Corp.,*
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) .......................................................................22

*Expoconsul International, Inc. v. A/E Systems, Inc.,*
    711 F. Supp. 730 (S.D.N.Y. 1989) ........................................................................18

*Feitelson v. Google Inc.,*
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................11

*Gates v. Wilkinson,*
    2003 WL 21297296 (S.D.N.Y. June 4, 2003) ......................................................19

*Giuliano v. Barch,*
    2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ......................................................19

*Hip Hop Beverage Corp. v. Monster Energy Co.,*
    733 Fed. Appx. 380 (9th Cir. 2018) .................................................................9, 10

*Hoffman Motors Corp. v. Alfa Romeo S.p.A.,*
    244 F. Supp. 70 (S.D.N.Y. 1965) .........................................................................20

*Industria Siciliana Asfalti v. Exxon Research & Engineering Co.,*
    1977 WL 1353 (S.D.N.Y. Jan. 18, 1977) ............................................................18

*Ingenito v. Riri USA, Inc.,*
    89 F. Supp. 3d 462 (E.D.N.Y. 2015) ....................................................................23

*In re Adderall XR Antitrust Litigation,*
    754 F.3d 128 (2d Cir. 2014) ..........................................................................11, 15

*In re Aluminum Warehousing Antitrust Litigation,*
    2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .....................................................13

*In re Elevator Antitrust Litigation,*
    502 F.3d 47 (2d Cir. 2007) .........................................................................2, 4, 15

*In re Mylan N.V. Securities Litigation,*
    379 F. Supp. 3d 198 (S.D.N.Y. 2019) ..................................................................13

*In re Ski Train Fire,*
    230 F. Supp. 2d 403 (S.D.N.Y. 2002) ..................................................................22

*In re SSA Bonds Antitrust Litigation,*
    420 F. Supp. 3d 219 (S.D.N.Y. 2019) ............................................................18, 24

*International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*,
    812 F.2d 786 (2d Cir. 1987)............................................................................3, 4

*Jazini v. Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998)................................................................................20

*Jonas v. Estate of Leven*,
    116 F. Supp. 3d 314 (S.D.N.Y. 2015)................................................................20

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)...................................................................................2

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)................................................................................24

*Maki v. Travelers Companies, Inc.*,
    2014 WL 7244843 (N.D.N.Y. Apr. 3, 2014), *report and recommendation
    adopted*, 2014 WL 7244961 (N.D.N.Y. Dec. 19, 2014)........................................5

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)................................................................14

*Maxon Hyundai Mazda* v. *Carfax, Inc.*,
    726 Fed. Appx. 66 (2d Cir. 2018)....................................................................9, 10

*Michael E. Jones, M.D., P.C. v. UnitedHealth Group, Inc.*,
    2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020)......................................................5

*MiniFrame Ltd. v. Microsoft Corp.*,
    551 Fed. Appx. 1 (2d Cir. 2013).........................................................................15

*Nicolosi Distributing, Inc. v. FinishMaster, Inc.*,
    2018 WL 4904918 (N.D. Cal. Oct. 9, 2018)......................................................10

*Nirvana, Inc.* v. *Nestle Waters North America Inc.*,
    123 F. Supp. 3d 357 (N.D.N.Y. 2015)..........................................................5, 6, 9

*Northeastern Telephone Co. v. American Telephone & Telegraph Co.*,
    651 F.2d 76 (2d Cir. 1981)....................................................................................6

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009)..............................................................................................5

*Penguin Group (USA) Inc. v. American Buddha*,
    609 F.3d 30 (2d Cir. 2010)....................................................................................3

*Reed Construction Data, Inc. v. McGraw-Hill Companies, Inc.*,
    638 Fed. Appx. 43 (2d Cir. 2016)........................................................................13

*Reynolds Metals Co. v. Columbia Gas System, Inc.*,
  669 F. Supp. 744 (E.D. Va. 1987) ......................................................20

*Savory Pie Guy, LLC v. Comtec Industries, Ltd.*,
  2016 WL 7471340 (S.D.N.Y. Dec. 28, 2016) ........................................3

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ............................................................................3

*Sprint Communications, L.P. v. Cox Communications, Inc.*,
  896 F. Supp. 2d 1049 (D. Kansas 2012) ..............................................21

*Tampa Electric Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ............................................................................9

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
  687 F. Supp. 832 (S.D.N.Y. 1988) ......................................................5

*Tese-Milner v. Diamond Trading Co.*,
  2010 U.S. Dist. LEXIS 143934 (S.D.N.Y. May 14, 2010)....................13

*Twin Laboratories, Inc. v. Weider Health & Fitness*,
  900 F.2d 566 (2d Cir. 1990)................................................................3

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)............................................................................14

*United States v. Smithfield Foods, Inc.*,
  332 F. Supp. 2d 55 (D.D.C. 2004)......................................................20

*United States v. Watchmakers of Switzerland Information Center*,
  133 F. Supp. 40 (S.D.N.Y. 1955) ..................................................18, 19

*United States ex rel. Hadid v. Johnson Controls, Inc.*,
  2005 WL 1630098 (E.D. Mich. July 7, 2005) .....................................21

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)............................................................................14

*Vista Food Exchange, Inc. v. Champion Foodservice, LLC*,
  124 F. Supp. 3d 301 (S.D.N.Y. 2015)..................................................16

*Waldman v. Palestine Liberation Organization*,
  835 F.3d 317 (2d Cir. 2016)................................................................16

*Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
  549 U.S. 312 (2007)............................................................................5

*Williams v. Canon, Inc.*,
432 F. Supp. 376 (C.D. Cal. 1977) ................................................20

*Williams v. Citigroup, Inc.*,
433 Fed. Appx. 36 (2d Cir. 2011) ................................................15

*Worldwide Home Products, Inc. v. Bed Bath and Beyond, Inc.*,
2013 WL 247839 (S.D.N.Y. Jan. 22, 2013) ................................5

**State Cases**

*America/International 1994 Venture v Mau*,
146 AD3d 40 [2d Dept 2016] ................................................23

*Benifits By Design Corp. v Contractor Management Services, LLC*,
75 AD3d 826 [3d Dept 2010] ................................................22

*Coast to Coast Energy, Inc. v Gasarch*,
149 AD3d 485 [1st Dept 2017]................................................23, 24

*Kreutter v McFadden Oil Corp.*,
71 NY2d 460 [1988] ................................................23

*Polansky v Gelrod*,
20 AD3d 663 [3d Dept 2005] ................................................23

*Porter v LSB Industries*,
192 AD2d 205 [4th Dept 1993] ................................................22, 23

**Federal Statutes**

Clayton Antitrust Act § 12, 15 U.S.C. § 22 ................................17, 18, 19

Sherman Antitrust Act § 2, 15 U.S.C. § 2................................1, 3, 14

**Rules**

Fed. R. Civ. P. 12(b)(2)................................................2, 25

Fed. R. Civ. P. 12(b)(6)................................................1, 2, 25

Fed. R. Evid. 201(b)(2) ................................................12

N.Y. CPLR § 301 ................................................22

N.Y. CPLR § 302................................................22, 23

## I.    INTRODUCTION

The Amended Complaint ("AC") (Dkt. No. 21) is the fourth attempt by plaintiff Twin

Bridges Waste and Recycling, LLC ("Twin Bridges") to plead antitrust claims against

defendants County Waste and Recycling Service, Inc. ("County Waste"), Robert Wright

Disposal, Inc. ("Robert Wright"), Waste Connections US, Inc. ("WCUSI"), and Waste

Connections, Inc. ("WCI").  Twin Bridges originally filed its Sherman Act claims as

counterclaims and third-party claims in state court; after defendants moved to dismiss for lack of

subject matter jurisdiction, Twin Bridges then filed amended counterclaims and third-party

claims in the state court action under New York state antitrust law.[1]  Twin Bridges filed the AC

in this court after defendants moved to dismiss the original federal complaint.

The AC asserts three counts of "attempt[ing] to monopolize the Waste Services market in

the Capital Region," purportedly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

AC ¶ 2.  Twin Bridges alleges that defendants engaged in predatory pricing (Count I); made

long-term contracts with customers and engaged in other marketing practices that Twin Bridges

dislikes (Count II); and refused to provide disposal services to Twin Bridges (Count III).

The AC must be dismissed under Fed. R. Civ. P. 12(b)(6).  All three counts are infirm

because the Complaint does not allege facts sufficient to establish that defendants have the

market power to create a dangerous probability of achieving a monopoly.  In addition:

- Twin Bridges fails to allege facts sufficient to establish that defendants have
  priced below their average variable cost, a necessary element of predatory pricing
  (Count I);

---

[1] *See County Waste and Recycling Service, Inc. v. Twin Bridges Waste and Recycling, LLC*,
Albany County Supreme Court Index No. 906904-20.  *See also* AC ¶ 334.

4847-7977-1887.3

- Twin Bridges has not alleged that the long-term contracts of which it complains have foreclosed any substantial portion of the relevant market, and its other "business tort" allegations do not state an antitrust claim (Count II); and

- Twin Bridges does not allege that defendants ever previously provided it disposal services and then stopped doing so; this precludes a refusal to deal claim as a matter of law (Count III).

The AC should also be dismissed as to WCI and WCUSI for lack of personal jurisdiction pursuant to Rule 12(b)(2). Both of those entities are foreign corporations that do not transact business or operate in this district. Moreover, neither WCI nor WCUSI exerts sufficient control over County Waste or Robert Wright to be subject to jurisdiction through them.

## II. THE LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the factual allegations of the complaint are taken as true, and all reasonable inferences are drawn in the plaintiff's favor. *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). But the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must be dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "'[B]ald assertions and conclusions of law will not suffice.'" *In re Elevator Antitrust Litigation*, 502 F.3d 47, 51 (2d Cir. 2007) (citation omitted). Furthermore, the Supreme Court has cautioned that "proceeding to antitrust discovery can be expensive," and "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Twombly,* 550 U.S. at 558 (citation omitted).

With respect to the Rule 12(b)(2) motion, the "plaintiff bears the burden of demonstrating

2

personal jurisdiction" – and "'to survive a motion to dismiss'" must "'make a prima facie showing that jurisdiction exists.'"  *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (citations omitted).

III.  **ALL THREE CLAIMS MUST BE DISMISSED BECAUSE TWIN BRIDGES DOES NOT ALLEGE THAT DEFENDANTS HAVE SUFFICIENT MARKET POWER TO HAVE A DANGEROUS PROBABILITY OF ACHIEVING A MONOPOLY.**

All three of Twin Bridges' claims allege attempted monopolization under Section 2 of the Sherman Act.  The elements of such a claim are "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  A dangerous probability of the defendant achieving monopoly power is thus an essential element of the claim.  *Id.* at 459.

To have such a dangerous probability, an antitrust defendant, among other things, must have sufficient market power – typically shown through the defendant's share of the relevant market.  "'A threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant' because a defendant's market share is 'the primary indicator of the existence of a dangerous probability of success.'"  *AD/SAT, a Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (quoting *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990)).  Although a substantial share of the relevant market does not, by itself, establish a dangerous probability of success, the lack of a substantial share is fatal to an attempt to monopolize claim.  *AD/SAT,* 181 F.3d at 229; *Savory Pie Guy, LLC v. Comtec Industries, Ltd.*, 2016 WL 7471340, *11 (S.D.N.Y. Dec. 28, 2016) (a 50% market share "is not enough to establish a dangerous probability of achieving monopoly power"); *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792

3

(2d Cir. 1987) ("[i]t is unlikely that even with a fifty percent market share" defendant "could raise prices without losing business to" competitors).

Twin Bridges has failed to plead adequately that defendants have sufficient market power here. Although it baldly asserts that defendants have a "substantial market share," "controlling market share," or "substantial, leading market share" (AC ¶¶ 77, 289, 346), Twin Bridges never alleges, even in approximate terms, what that share is or the facts upon which such an allegation would lie. The mere incantation of antitrust buzzwords cannot save the claim. *See In re Elevator*, 502 F.3d at 51 ("'bald assertions and conclusions of law will not suffice'") (citation omitted). Plaintiff's failure to allege specific facts relating to market share is not surprising, because as it implicitly concedes, there is vigorous competition in the market: there are "other waste management companies in the Capital Region" aside from Twin Bridges, County Waste, and Robert Wright, and these "[c]ompeting Waste Services providers . . . include third-parties located outside of New York." AC ¶¶ 301, 325.

The AC's only specific market share allegation is that "[a]t the time Twin Bridges entered the market, County Waste and Robert Wright had well over fifty percent of the *residential subscription-based customers*." AC ¶ 78 (emphasis added). But the alleged relevant market is "the provision [of] Waste Services to residential, *commercial and governmental*" customers, not "residential subscription-based" customers. *Id*. ¶ 101 (emphasis added). Defendants' alleged share of "residential subscription-based customers" – themselves a mere subset of "residential customers" – says nothing about their share of the much larger relevant market that Twin Bridges alleges. Moreover, Twin Bridges "entered the market" two years ago (*id.* ¶ 88); even as to residential subscription-based customers, the AC does not allege what defendants' share is now, or how that share compares to the summer of 2019.

4847-7977-1887.3

Twin Bridges has thus simply failed to allege any facts that, if true, would establish that defendants have sufficient market power to have a dangerous probability of achieving a monopoly. Accordingly, the AC should be dismissed. *Michael E. Jones, M.D., P.C. v. UnitedHealth Group, Inc.,* 2020 WL 4895675, *7 (S.D.N.Y. Aug. 19, 2020) ("vague and non-committal invocations of antitrust buzzwords" are "insufficient to state an entitlement to relief"); *Maki v. Travelers Companies, Inc*., 2014 WL 7244843, *6 (N.D.N.Y. Apr. 3, 2014), *report and recommendation adopted*, 2014 WL 7244961 (N.D.N.Y. Dec. 19, 2014) (allegations of "virtual monopoly," "near monopoly," and "monopoly power" insufficient); *Worldwide Home Products, Inc. v. Bed Bath and Beyond, Inc*., 2013 WL 247839, *3 (S.D.N.Y. Jan. 22, 2013) (dismissal where pleading did not provide "even a rough estimate" of "the market share breakdown"); *Crossword Magazine, Inc. v. Times Books*, 1997 WL 227998, *2 (E.D.N.Y. May 5, 1997) (dismissal because allegation that defendant was "the 'major producer'" was insufficient); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 838 (S.D.N.Y. 1988) (dismissal for failure to allege sufficient market share).

## IV.    THE COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS  TO ESTABLISH DEFENDANTS' PRICES ARE PREDATORY (COUNT I).

Count I alleges predatory pricing. Such a claim requires, among other things, that the defendant (1) engaged in pricing "'below an appropriate measure of'" the defendant's costs, and (2) has "'a dangerous probability of recouping its investment in below-cost prices'" by later raising its prices. *Weyerhauser Co.* v. *Ross-Simmons Hardwood Lumber Co*., *Inc.*, 549 U.S. 312, 318-319 (2007) (quoting *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp*., 509 U.S. 209, 222-224 (1993)); *Affinity LLC v. GfK Mediamark Research & Intelligence, LLC,* 547 Fed. Appx. 54, 56 (2d Cir. 2013); *Nirvana, Inc.* v. *Nestle Waters North America Inc.*, 123 F. Supp. 3d 357, 372-373 (N.D.N.Y. 2015).

4847-7977-1887.3

These elements are demanding for a simple reason: "aggressive price competition" benefits consumers. *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 451 (2009). "'[C]utting prices in order to increase business often is the very essence of competition.' . . . In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Id.* (citation omitted); *accord*, *Nirvana*, 123 F. Supp. 3d at 373. Here, Twin Bridges has failed to properly allege the first element of the claim – that defendants priced below the appropriate measure of their costs.

In the Second Circuit, the appropriate measure of cost in predatory pricing cases generally is average variable cost – as a surrogate for marginal cost. *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (2d Cir. 1981); *Nirvana*, 123 F. Supp. 3d at 373 n.3. In an apparent attempt to bolster its conclusory assertion that defendants have priced below "anticipated average variable costs" (*e.g.*, AC ¶¶ 338, 347), the AC asserts (1) that defendants lowered prices after Twin Bridges entered the market (*id.* ¶107); (2) that defendants have charged some residential customers a monthly fee that "does not cover the average cost to collect residential waste and recyclables" plus "disposal costs for residential waste and recyclables" based on a purported "average" per ton (*id.* ¶¶ 136, 137 & n.31); and (3) that certain categories of expenses – whose specific costs are unstated – are included in defendants' "variable costs" (*id.* ¶¶ 132, 149, 163, 177, 190). None of these assertions supports Twin Bridges' claim.

First, even assuming that defendants reduced prices after Twin Bridges' market entry, such a response is the very essence of consumer-benefitting competition that the antitrust laws are designed to protect. *Pacific Bell*, 555 U.S. at 451 ("'[l]ow prices benefit consumers

regardless of how those prices are set'") (citation omitted).

Second, Twin Bridges' assertion that defendants offered prices below an alleged "average cost" is unavailing. As a starting point, these allegations concern only *residential* waste, but say nothing about the waste of commercial and governmental customers, which are also part of the alleged relevant market. AC ¶¶ 101, 136-137. And "average cost" is not the same as "average variable cost." Finally, and most importantly, it is *defendants*' costs that matter – not some average based on unspecified costs of other waste haulers.

Indeed, the AC readily acknowledges that defendants' costs are *lower* than those of their rivals. Twin Bridges asserts that defendants are vertically integrated (AC ¶¶ 74, 76, 373), with waste and recycling collection services and their own disposal sites (*id.* ¶¶ 4, 288). By contrast, Twin Bridges claims that it and others do not have their own disposal sites, and have to pay third parties to dispose of waste at landfills. *Id.* ¶¶ 8, 373, 374, 378. And Twin Bridges asserts that it has to haul its waste to distant disposal sites – causing it to incur even higher costs. *Id.* ¶¶ 297, 377, 378. Furthermore, the AC establishes that defendants have economies of scale; it alleges that defendants and their subsidiaries are collectively the third largest waste company in North America and operate in 42 states. *Id.* ¶¶ 3, 31. And finally, as Twin Bridges avers, defendants have greater route density than other haulers – their customers are "close together on [their] routes," and "[t]he better a firm's route density, the lower its operating costs." *Id.* ¶¶ 217, 237. The AC itself thus establishes that purported average costs of others are not a surrogate for defendants' costs. *Astra Media Group, LLC* v. *Clear Channel Taxi Media*, *LLC*, 414 Fed. Appx. 334, 336 (2d Cir. 2011) (dismissing predatory pricing claim where, as here, the complaint was "silent with respect to" defendant's "actual costs" and plaintiff instead relied on an alleged "'industry standard' cost" while, as here, providing "no basis to infer reasonably that" the

defendant, which "may enjoy substantial economies of scale[,] has the same cost structure as the rest of the industry"); s*ee Affinity LLC,* 547 Fed. Appx. at 56 (where plaintiff "references its own costs in an attempt to allege that" defendant "priced below an 'appropriate measure of [ ] costs[,]'" "such an allegation is 'entirely conclusory and unavailing,'" particularly where, as here, plaintiff "makes no allegations" to "'undercut the obvious inference that Defendant realized efficiencies in developing, marketing, and delivering its services due to its size'") (citation omitted).[2]

Nor does Twin Bridges gain succor from its allegations that the components of "variable costs" include "labor, fuel, vehicle upkeep," and "disposal fees." AC ¶¶ 132, 149, 163, 177, 190. Twin Bridges does not specify the *amount* of any of these costs for defendants. And as to "disposal fees," as noted above, Twin Bridges repeatedly asserts that defendants own and operate their own landfills and transfer stations. *Id.* ¶¶ 4, 288.

Twin Bridges has failed to allege facts to support the conclusion that defendants have priced below their average variable costs,[3] and therefore the predatory pricing claim must be dismissed.

---

[2] Plaintiff's allegation that defendants' average variable costs are $15-27 per residential customer (AC ¶ 131) similarly fails. Again, this allegation concerns only residential customers, who comprise only a portion of the proposed market. AC ¶ 101. Moreover, the $15-27 figure is merely derived from Twin Bridges' faulty allegations, described above, of the "average cost to collect residential waste and recyclables." AC ¶¶ 136-137.

[3] Twin Bridges' emphasis on the importance of waste collection route density (AC ¶ 217) underscores another point: defendants' actual cost of adding a customer on a route (or the saved cost if a customer is lost) is minimal. If potential customer B lives next door to existing customer A, defendants need to invest minimal time and effort to serve customer B. Although not necessary to a decision on this motion, the defendants' appropriate cost in such an instance is not average variable cost across all customers, but the incremental cost of adding customer B.

4847-7977-1887.3

**V. COUNT II MUST BE DISMISSED BECAUSE IT DOES NOT ALLEGE THAT THE CONTRACTS OF WHICH IT COMPLAINS HAVE CAUSED SUBSTANTIAL FORECLOSURE IN THE MARKET AND ITS OTHER ALLEGATIONS ARE INFIRM.**

In its second count, Twin Bridges alleges that defendants attempted to monopolize through the "use of never-ending and/or automatically renewing customer contracts" and a catalogue of other alleged acts it dislikes. AC ¶ 358. This count fails to state a claim because Twin Bridges does not allege the required substantial foreclosure of a relevant market, and its litany of remaining grievances do not establish an attempt to monopolize.

**A. There is no valid allegation that the customer contracts foreclosed any substantial share of the market.**

Twin Bridges alleges that defendants have used "never-ending residential contracts that effectively prevent consumers from switching their Waste Services provider." AC ¶ 214. In attempted support, it alleges that Robert Wright "sent contracts to *one or more* customers" containing automatic renewal provisions, requiring written notice of termination, and giving Robert Wright the right to match competing offers. *Id.* ¶ 226 (emphasis added).

It is hornbook law, however, that an antitrust claim based on long-term contracts or other exclusive dealing with customers will not lie unless those contracts foreclose competitors from a substantial share of the relevant market. *Maxon Hyundai Mazda* v. *Carfax, Inc.*, 726 Fed. Appx. 66, 70 (2d Cir. 2018) ("exclusive arrangements" must have "substantially foreclosed competition in the [relevant] market"); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 Fed. Appx. 380, 381 (9th Cir. 2018) ("[m]ere injury to [plaintiff]'s position as a market competitor is not sufficient"; "in a case alleging an exclusive-dealing arrangement," plaintiff must "plead that the arrangement 'foreclose[d] competition in a substantial share of the line of commerce affected'") (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *Nirvana*, 123 F. Supp. 3d at 376 ("[t]o state a violation, the exclusive dealing agreement must foreclose

competition in a substantial share of the relevant market").  And as these cases indicate, an antitrust plaintiff must establish harm to the relevant market as a whole, not to individual competitors.  *See e.g., Maxon*, 726 Fed. Appx. at 68 (plaintiff "bear[s] the burden" to "'demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market'") (citation omitted).  If only a modest percentage of a market is foreclosed by long-term or exclusive contracts, there can be no such market-wide harm.

Here, although Twin Bridges makes the threadbare assertion that the contracts "encompass a substantial share of the relevant market " (AC ¶ 238), it never says what that share is, or gives even an approximation of how many customers have signed such agreements.  Indeed, it says only that Robert Wright sent the contracts to "one or more customers."  AC ¶ 226.[4]  The mere invocation of the buzzwords "substantial share" cannot save the claim: "a plaintiff's obligation . . . requires more than labels and conclusions" (*Twombly*, 550 U.S. at 555), and "mere conclusory statements, do not suffice" (*Iqbal*, 556 U.S. at 678).

Because Twin Bridges has failed to allege facts to support the necessary element of substantial foreclosure, its exclusive contracts attack must fail.  *Hip Hop Beverage*, 733 Fed. Appx. at 381 (affirming dismissal of complaint that alleged "four brokers refused to do business with" plaintiff "due to" defendant's conduct, but, as here, "did not allege how many total brokers were in the market in order to establish that [defendant] foreclosed competition" and, also as here, "conceded that [plaintiff] remained in the market" regardless); *Nicolosi Distributing, Inc. v. FinishMaster, Inc.*, 2018 WL 4904918, *6 (N.D. Cal. Oct. 9, 2018) (dismissing complaint where plaintiff did "not allege what percentage of" the relevant market the defendant had "captured");

---

[4]  Notably, AC ¶ 318 alleges that Robert Wright's "stronghold" is only a portion of Albany County – itself just one of the seven counties in the alleged geographic market (*id.* ¶¶ 101-102).

*Feitelson v. Google Inc*., 80 F. Supp. 3d 1019, 1031-1032 (N.D. Cal. 2015) (same).

**B.      The Tortious Interference and Other Business Tort Allegations Do Not Support the Claim.**

Twin Bridges also offers a litany of miscellaneous allegations in support of Count II, including that defendants have tortiously interfered with its relations with existing and future customers, made false statements, and "attempted to collude with other waste management companies to refuse to deal with Twin Bridges."  AC ¶ 300.  But it is a black-letter principle that "business disputes" do not "implicate the antitrust laws simply because they involve competitors."  *In re Adderall XR Antitrust Litigation*, 754 F.3d 128, 135 (2d Cir. 2014).  "'Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce."'"  *Id.* (quoting *Brooke Group,* 509 U.S. at 225).  Twin Bridges' bad act allegations are insufficient to plead an attempt to monopolize.

The AC's theory of tortious conduct as attempted monopolization[5] rests on its allegations that defendants offered prices lower than Twin Bridges would have preferred; "sent Twin Bridges over 100 'cease and desist' letters" asking it not to deal with customers who defendants said were under contract; and provided false information to customers about their contracts.  AC ¶¶ 239-286.  These allegations can be easily disposed.

Twin Bridges' complaints about defendants' pricing must be placed, if at all, under its

---

[5] Twin Bridges is prosecuting state law counterclaims and third-party claims against the defendants – based on the exact same factual allegations – for tortious interference (two counts), unfair competition, injurious falsehood, and prima facie tort in the parties' state court case, *County Waste v. Twin Bridges,* Albany County Supreme Court Index No. 906904-20.

11

predatory pricing claim in Count I. And for the reasons discussed above, that count must be dismissed. As to the alleged cease and desist letters to Twin Bridges and alleged false statements to customers, Twin Bridges does not even claim that the customers it cites either stopped or refused to start service with Twin Bridges.[6] Furthermore, 100 cease and desist letters – or statements to a few customers – are simply insufficient to constitute an unlawful attempt to monopolize. *See Affinity LLC*, 547 Fed. Appx. at 57 (plaintiff asserted competitor "disseminated false, misleading statements," but, as here, had "not alleged facts which, if proved, would be sufficient to overcome the presumption of a *de minimis* impact on competition"). These few alleged acts can establish neither the market-wide harm to competition nor the requisite dangerous probability of success required for an attempt to monopolize claim.

The same is true for the allegation that an agent of Robert Wright wrote a letter stating that Twin Bridges' owner, Scott Earl, "was indicted for defrauding Colonie Landfill by falsifying weight tickets." AC ¶ 308. Twin Bridges' complaint about this letter is difficult to understand, given that the New York Attorney General in fact issued a press release in 2010 proclaiming that County Waste (then owned by Mr. Earl) and Earl were paying "Nearly $1 Million For Defrauding Town of Colonie."[7] The AC does not allege that any customers did not do business with Twin Bridges (or others) because of the letter, let alone that competition in the market as whole was harmed by it. Furthermore, under Second Circuit law, a false statement is presumed

---

[6] *See* AC ¶¶ 252-286.

[7] https://ag.ny.gov/press-release/2010/new-york-state-attorney-general-andrew-m-cuomo-announces-county-waste-pay-nearly (headline). The press release, which resides on an official government website of which the Court can take judicial notice under Fed. R. Evid. 201(b)(2), said that Earl's then-company had "submitted vouchers underreporting the amount of waste delivered to the Town of Colonie's landfill," and called the company's actions a "[s]cam[.]" *Id.*

to have a *de minimis* impact on competition, and Twin Bridges does not allege any facts to overcome that presumption here.  *See Affinity LLC*, 547 Fed. Appx. at 57.[8]

Finally, the allegation that defendants have "*attempted* to collude with other waste management companies to refuse to deal with Twin Bridges" (AC ¶ 300 (emphasis added)) fails for two reasons.  First, Twin Bridges does not allege that any of these "other waste management companies" (none of whom are identified in the complaint) *actually* colluded with defendants, or agreed with defendants not to deal with Twin Bridges.  An unconsummated attempt to collude, even if true, could not have harmed competition in the market as a whole (or for that matter, harmed Twin Bridges).  Second, even if Twin Bridges alleged that the defendants had actually agreed with other waste haulers, its conspiracy allegation would fail because the AC does not identify any of the waste companies with whom defendants allegedly conspired or other conspiratorial facts.  *In re Mylan N.V. Securities Litigation*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (antitrust allegations insufficient where complaint "'mention[ed] no specific time, place, or person involved in the alleged conspiracies'") (quoting *Twombly*, 550 U.S. at 565 n.10); *In re Aluminum Warehousing Antitrust Litigation*, 2014 WL 4277510, *38 (S.D.N.Y. Aug. 29, 2014) (granting motion to dismiss; "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose"); *Tese-Milner v. Diamond Trading Co.*, 2010 U.S. Dist. LEXIS 143934, *48-49 (S.D.N.Y. May 14, 2010) (a "well-pleaded complaint should

---

[8]   To overcome the presumption of *de minimis* effect, the allegedly false statement must be "'(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals.'"  *Reed Construction Data, Inc. v. McGraw-Hill Companies, Inc.*, 638 Fed. Appx. 43, 46 (2d Cir. 2016) (citation omitted).  Here, where there was only a single alleged statement – and where the state Attorney General publicly announced that Twin Bridges' owner's previous company "Defraud[ed]" the "Town of Colonie" (*see supra* note 7 and accompanying text) – these elements cannot remotely be met.

include specific, factual allegations as to 'the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts . . . they performed'") (quoting *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 484 (S.D.N.Y. 2001)).

## VI.   THE REFUSAL TO DEAL CLAIM (COUNT III) MUST BE DISMISSED BECAUSE DEFENDANTS HAD NO OBLIGATION TO PROVIDE DISPOSAL SERVICES TO TWIN BRIDGES.

In Count III, Twin Bridges asserts that defendants are liable for attempted monopolization because they refused to provide Twin Bridges disposal services, allegedly forcing Twin Bridges to use other facilities at higher cost. AC ¶¶ 367-383. In fact, in the newspaper article specifically referenced at AC ¶ 316, Twin Bridges owner Scott Earl boasted that the company was able to make "a low offer" to customers precisely because it "doesn't have to use Waste Co[nn]ections controlled transfer and waste stations" and instead sends its material "to a plant in Glenville where the prices for dumping trash have not increased."[9] But regardless of its factual falsity, the refusal to deal claim fails because Twin Bridges does not allege that defendants provided it access to their disposal facilities in the past. That is fatal to the claim.

"[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). In the Second Circuit, the sole exception to that rule,

---

[9] "Capital Region trash companies at war again over customer base," *Albany Times-Union*, August 21, 2020, https://www.timesunion.com/business/article/Capital-Region-trash-companies-at-war-again-over-15505114.php, cited at AC ¶ 316.

even for an alleged monopolist, is where the defendant terminated a prior voluntary course of dealing. *In re Adderall*, 754 F.3d at 134 ("[t]oday, 'the sole exception to the broad right of a firm to refuse to deal with its competitors' comes into play only 'when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor'") (quoting *In re Elevator,* 502 F.3d at 52, 53); *MiniFrame Ltd. v. Microsoft Corp.*, 551 Fed. Appx. 1, 2 (2d Cir. 2013) (failure to "allege that [defendant] had any prior dealing" is fatal to refusal to deal claim); *Williams v. Citigroup, Inc.*, 433 Fed. Appx. 36, 38 (2d Cir. 2011) (where, as here, the claim is based on an alleged "monopolist's refusal to deal, the plaintiff must allege that the defendant terminated a prior, voluntary course of dealing").

In re Elevator* is the Second Circuit's seminal case on this issue. Purchasers of elevators and elevator maintenance services alleged that the defendants had attempted to monopolize the elevator maintenance market by "refus[ing] to deal with third-party maintenance providers[.]" 502 F.3d at 52. The Second Circuit upheld the dismissal of the claim: "because plaintiffs do not allege that defendants terminated any prior course of dealing – *the sole exception* to the broad right of a firm to refuse to deal with its competitors – the allegations are insufficient to state a unilateral-monopolization claim." *Id.* (emphasis added).

The Second Circuit has applied this rule in other cases, including *In re Adderall*. There, plaintiffs challenged the defendant drug companies' refusal to supply them with unbranded versions of a patented drug for resale. 754 F.3d at 130. The Second Circuit upheld the dismissal of the complaint. The defendants "did not terminate any prior course of dealing," and the complaint thus did not fall within the "narrow exception" available to plaintiffs. *Id.* at 135, 136.

Twin Bridges does not allege that defendants provided disposal services to Twin Bridges and then stopped. Accordingly, its refusal to deal claim fails to state a claim upon which relief

can be granted.

## VII.    THE COURT LACKS PERSONAL JURISDICTION OVER WCI AND WCUSI.

"To exercise personal jurisdiction lawfully, three requirements must be met": (1) valid service of process; (2) "'a statutory basis for personal jurisdiction'"; and (3) compliance "'with constitutional due process principles.'" *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 327 (2d Cir. 2016) (citations omitted). Here, no statute provides a basis for jurisdiction over WCI or WCUSI, and the exercise of jurisdiction would violate due process.

WCI and WCUSI are, respectively, a holding company and an administrative company. Neither is incorporated in New York or has an office or employees in this state; neither does business here. Twin Bridges simply attempts, without any factual basis, to lump WCI and WCUSI together with County Waste and Robert Wright, and to mischaracterize the typical and appropriate administrative services WCUSI provides for its indirect subsidiaries.

### A.    Jurisdictional Facts

WCI is a publicly-traded, Canadian corporation with its principal place of business in Canada. June 17, 2021 Declaration of Domenico D. Pio ("Pio Dec.")[10] ¶¶ 6-7. A holding company, WCI is the ultimate parent of the other defendants. *Id.* ¶ 7. WCUSI is a Delaware corporation with its principal place of business in Texas. *Id.* ¶ 8. County Waste is a sub-subsidiary of WCUSI; in 2020, County Waste acquired Robert Wright. *Id.* ¶¶ 9-10. Unlike WCI and WCUSI, County Waste and Robert Wright provide waste collection, recycling, transfer, and disposal services. *Id.* ¶¶ 11, 22.

WCI has no waste collection, recycling, transfer, or disposal services operations, and no

---

[10] It is "proper for the Court to consider the parties' affidavits" on a motion to dismiss for lack of personal jurisdiction. *Vista Food Exchange, Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 307 (S.D.N.Y. 2015).

4847-7977-1887.3

employees; WCUSI is an administrative company that provides services such as payroll for its subsidiaries. *Id.* ¶¶ 12-13. Neither WCI nor WCUSI is licensed to do business in New York; has an office, telephone, or real property in New York; is taxed in New York; or has entered into or guaranteed the performance of any contract in New York. *Id.* ¶¶ 14-18, 41, 43.

Moreover, contrary to the misguided allegations in the AC, neither WCI nor WCUSI has any employees in New York. *Id.* ¶¶ 16, 33. Although WCUSI provides administrative payroll services for the employees of County Waste and Robert Wright, the subsidiaries, not WCUSI, are parties to the actual employment-related agreements with their respective employees[11] – and the employees' pay and benefits are charged to County Waste and Robert Wright, not to WCUSI. *Id.* ¶¶ 33, 34. Neither WCI nor WCUSI hires, fires, assigns, selects, controls, or supervises the employees – or the day-to-day operations – of County Waste, Robert Wright, or any other New York entity. *Id.* ¶¶ 20, 21, 25.

The defendants observe all corporate formalities; they keep separate corporate minutes, books, and records, hold separate board and shareholders' meetings, and maintain separate by-laws and procedures. *Id.* ¶ 22. Neither County Waste nor Robert Wright is financially dependent on WCI or WCUSI; WCI and WCUSI do not interfere in County Waste's or Robert Wright's marketing, sales, pricing, or waste and recycling operations. *Id.* ¶¶ 24, 26. WCI's annual report states that "[w]e manage our operations on a decentralized basis." *Id.* ¶ 21.

**B.      The Relevant Federal Statute (Clayton Act Section 12) Does Not Authorize Personal Jurisdiction Over WCI or WCUSI**

Section 12 of the Clayton Antitrust Act provides:

> Any suit, action, or proceeding under the antitrust laws against a

---

[11] *See, e.g., County Waste v. Twin Bridges,* Albany County Supreme Court Index No. 906904-20, Dkt. No. 4, Confidentiality and Non-Competition Agreement between County Waste and employee Mark Dougall.

> corporation may be brought not only in the judicial district whereof
> it is an inhabitant, but also in any district wherein it may be found
> or transacts business; and all process in such cases may be served
> in the district of which it is an inhabitant, or wherever it may be
> found.

15 U.S.C. § 22.  This provision "'specifies where suit against a corporation under the antitrust laws may be brought'"; "'if a corporation is not an inhabitant of, is not found in, and does not transact business in, the district, suit may not be'" brought there.  *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 424 (2d Cir. 2005) (citation omitted).

### 1.    Neither WCI Nor WCUSI Is an Inhabitant of the Northern District of New York

"For a corporation, 'inhabitant' means its place of incorporation."  *In re SSA Bonds Antitrust Litigation*, 420 F. Supp. 3d 219, 230 n.4 (S.D.N.Y. 2019) (citing *Expoconsul International, Inc. v. A/E Systems, Inc*., 711 F. Supp. 730, 732-33 (S.D.N.Y. 1989)).  WCI is incorporated in Canada, and WCUSI is incorporated in Delaware.  AC ¶¶ 17, 18.

### 2.    Neither WCI Nor WCUSI Is Found in the NDNY

"To 'be found' in a district requires more than 'transacting business' there"; there must be "'proof of continuous local activities.'"  *In re SSA Bonds,* 420 F. Supp. 3d at 230 n.5 (quoting *United States v. Watchmakers of Switzerland Information Center*, 133 F. Supp. 40, 42–43 (S.D.N.Y. 1955)).  *Accord*, *Industria Siciliana Asfalti v. Exxon Research & Engineering Co*., 1977 WL 1353, *15 n.10 (S.D.N.Y. Jan. 18, 1977) ("'[t]he word "found" within this provision of the Clayton Act connotes presence and *continuous* local activities within the district'") (citation omitted) (emphasis in original).

The only basis on which WCI and WCUSI could be "found" in this district is through their relationship with County Waste and Robert Wright.  But "there is no dispute" that even "a parent's complete commercial and financial domination of its subsidiary d[oes] not bring the

18

parent within the jurisdiction as long as the formal separation" between the entities is "scrupulously maintained" and "the substance of corporate independence" is "preserved." *Watchmakers of Switzerland*, 133 F. Supp. at 45. That is the case here, where the defendants observe all corporate formalities and have separate, well-defined business functions – holding company (WCI), administrative services (WCUSI), and operations (County Waste and Robert Wright). Pio Dec. ¶¶ 11-13, 19-27.[12]

### 3. Neither WCI Nor WCUSI Transacts Business in the NDNY

The phrase "transacts business" in Clayton Act § 12

> ". . . refer[s] to 'the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'" . . . "[T]here must be 'some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district.'"

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 198–99 (S.D.N.Y. 2018) (quoting *Daniel*, 428 F.3d at 428, and *Gates v. Wilkinson*, 2003 WL 21297296, *1 (S.D.N.Y. June 4, 2003)).

WCI and WCUSI, in their own right, do no business in this district at all. And the mere fact that they are "parent companies of subsidiaries that transact business in New York do[es] not suffice to show that the parent companies transact business in New York." *Dennis*, 343 F. Supp. 3d at 199. The parent must be "not merely passive" but "directly involved in the business operations of" the local subsidiary, exercising "sufficient control" over it. *All Star Carts &*

---

[12] Twin Bridges improperly attempts to combine the defendants simply by a device of nomenclature – repeatedly referring to them collectively as "Waste Connections." AC ¶¶ 2, 30. *See Giuliano v. Barch*, 2017 WL 1234042, *14 (S.D.N.Y. Mar. 31, 2017) ("[l]umping all the 'defendants' together for purposes of alleging connections to" the forum is "patently insufficient"; "plaintiff must establish a basis for subjecting each of them, individually, to the jurisdiction of the court"); *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (it is inappropriate to "collapse[]" parents and subsidiaries "into one").

4847-7977-1887.3

*Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 638-639 (E.D.N.Y. 2009). *See also Hoffman Motors Corp. v. Alfa Romeo S.p.A.*, 244 F. Supp. 70, 76 (S.D.N.Y. 1965) (finding parent transacted business through local subsidiary where the latter "was an instrumentality" and the parent "completely controlled" it). "Sufficient control" has been defined as "continuing supervision of and intervention in the subsidiaries' affairs[.]" *Campos v. Ticketmaster Corp*., 140 F.3d 1166, 1173 (8th Cir. 1998). *Accord, United States v. Smithfield Foods, Inc*., 332 F. Supp. 2d 55, 61 (D.D.C. 2004).

"The majority of cases have" required "clear control by the parent before finding" personal jurisdiction. *Reynolds Metals Co. v. Columbia Gas System, Inc*., 669 F. Supp. 744, 749 (E.D. Va. 1987). "[A]s long as the separation" between the entities "is real[,]" the parent is not transacting business through its subsidiary. *Williams v. Canon, Inc*., 432 F. Supp. 376, 379 (C.D. Cal. 1977).

Here, the AC makes only a single conclusory allegation that WCI or WCUSI controls County Waste or Robert Wright. AC ¶ 40. That is clearly insufficient. *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 328 (S.D.N.Y. 2015) ("'control cannot be shown based merely'" on "'conclusory allegations'") (citation omitted); *Jazini v. Nissan Motor Co., Ltd*., 148 F.3d 181, 185 (2d Cir. 1998) ("conclusory non-fact-specific jurisdictional allegations" are inadequate). The simple fact is that County Waste and Robert Wright conduct their operations independently. Pio Dec. ¶¶ 19-27. WCI and WCUSI do not control those operations, and thus they do not transact business in this district.

### 4.    WCUSI's Administrative Services for Its Subsidiaries Do Not Provide any Basis for Jurisdiction

Twin Bridges' handful of specific jurisdictional allegations are essentially all based on the administrative services WCUSI provides for its indirect subsidiaries. *See* AC ¶¶ 52-67

(alleging that WCUSI has employees in New York based on W-2 payroll forms, and that WCUSI provides insurance, benefits, and other services for its subsidiaries).  Many of these allegations are factually incorrect or misleading.  *See, e.g.,* Pio Dec. ¶¶ 33-43 (neither WCI nor WCUSI has employees in New York, or enters into or guarantees contracts in New York).

Moreover, a "corporate parent may provide administrative services for its subsidiary in the ordinary course of business without calling into question the separateness of the two entities for purposes of personal jurisdiction." *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp*., 230 F.3d 934, 945 (7th Cir. 2000) (providing payroll services and arranging benefits for employees of subsidiary is not sufficient to subject parent to jurisdiction).  "Parent corporations regularly provide certain services to their subsidiaries.  Such parents [rightly] do not expect that performing these activities may subject them to liability because of the actions of the subsidiaries." *Id.*  "[A]n ordinary relationship between a corporation and its subsidiary" "frequently involves the provision of assistance with payroll services"; this "is insufficient to give rise to personal jurisdiction over the parent." *Cardenas v. McLane FoodService, Inc*., 2010 WL 11465450, *5 (C.D. Cal. Oct. 25, 2010).  The relationship of "parent to subsidiary contemplates a close financial connection and certain degree of direction and management.  Broad oversight is acceptable, and the provision of administrative services by a parent for a subsidiary does not trigger personal jurisdiction" over the parent. *United States ex rel. Hadid v. Johnson Controls, Inc*., 2005 WL 1630098, *5 (E.D. Mich. July 7, 2005).  *Accord, Sprint Communications, L.P. v. Cox Communications, Inc*., 896 F. Supp. 2d 1049, 1058 (D. Kansas 2012) ("[m]erely providing . . . administrative services to a subsidiary will not subject a parent company to personal jurisdiction").

21

**C.    The New York State Jurisdictional Statutes (CPLR §§ 301-302) Provide No Basis for Personal Jurisdiction over WCI or WCUSI**

**1.    There Is No General Jurisdiction Under CPLR § 301 Because County Waste and Robert Wright Are Not "Mere Departments" of WCI or WCUSI**

General jurisdiction under CPLR § 301 over a foreign corporation like WCI or WCUSI "may be based on the presence of a subsidiary" only "when the parent exercises such complete control 'that the subsidiary is, in fact, merely a department of the parent'" (*Benifits By Design Corp. v Contractor Management Services, LLC*, 75 AD3d 826, 829 [3d Dept 2010] (citation omitted)) – that is, "only when 'the activities of the parent show a disregard for the separate corporate existence of the subsidiary'" (*ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 51 (S.D.N.Y. 1999) (citation omitted)).

"A subsidiary will be considered a 'mere department' only if the foreign parent's control of the subsidiary is so pervasive that the corporate separation is more formal than real." *Porter v LSB Industries,* 192 AD2d 205, 213 [4th Dept 1993].[13]  In such cases, "the common thread is" that "the subsidiary was performing the same activities" that "the parent would have performed had it been doing or transacting business in New York." *Id.* at 214.  "That is not the case" where the parent "is a holding company" like WCI, whose business "differs from the business of" the subsidiary (*id.*) – in this case, for County Waste and Robert Wright, the collection and disposal of waste and recycling.  Pio Dec. ¶ 22.  With both holding company WCI and administrative company WCUSI, the "business of the parent is carried out entirely at the parent level," and County Waste and Robert Wright, which have different functions, "cannot be deemed to be

---

[13]  To establish financial dependence (and thus ultimately control), the plaintiff "must show that the subsidiary 'cannot run its businesses without the financial backing of its parent.'"  *American Lecithin Co. v. Rebmann*, 2017 WL 4402535, *7 (S.D.N.Y. Sept. 30, 2017) (quoting *In re Ski Train Fire*, 230 F. Supp. 2d 403, 410 (S.D.N.Y. 2002)).  Twin Bridges does not allege this, and it is in fact not the case.  Pio Dec. ¶ 24.

22

conducting the parent's business as its agent." *Porter,* 192 AD2d at 214-215.

## 2. There Is No Specific Jurisdiction Under CPLR § 302

AC ¶ 29 parrots the provisions of CPLR § 302(a), the New York long-arm statute. But because neither WCI nor WCUSI themselves have transacted any business, contracted to supply goods or services, or committed a tortious act causing injury in New York, they can only be subject to specific jurisdiction if they performed those acts, in the words of the statute, "through an agent" – again, County Waste and Robert Wright.

Under CPLR § 302, a "plaintiff attempting to establish personal jurisdiction over a defendant" that allegedly "acted through subsidiaries or agents" must

> show that the subsidiary "engaged in purposeful activities in this State," that those activities were "for the benefit of and with the knowledge and consent of" the defendant, and that the defendant "exercised some control over" the subsidiary in the matter that is the subject of the lawsuit.

*Ingenito v. Riri USA, Inc*., 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015) (quoting *Kreutter v McFadden Oil Corp*., 71 NY2d 460, 467 [1988]). "'The critical factor is the degree of control[.]'" *America/International 1994 Venture v Mau,* 146 AD3d 40, 54 [2d Dept 2016] (citation omitted).

Here, Twin Bridges at most "offers only the conclusory allegation that" County Waste and Robert Wright are WCI's and WCUSI's "agent[s], with no supporting evidentiary facts establishing control." *Polansky v Gelrod*, 20 AD3d 663, 664 [3d Dept 2005]. This is insufficient:

> "[T]o make a prima facie showing of 'control,' a plaintiff's allegations must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a 'primary actor' in the specific matter in question; control cannot be shown based merely upon . . . conclusory allegations[.]"

23

*Coast to Coast Energy, Inc. v Gasarch,* 149 AD3d 485, 487 [1st Dept 2017] (citations omitted).

As discussed above, WCI and WCUSI do not in fact control County Waste and Robert Wright (Pio Dec. ¶¶ 19-27), and therefore they are not subject to long-arm jurisdiction.

### D.      Subjecting WCI and WCUSI to Jurisdiction Would Violate Due Process

"The touchstone due process principle" is that "the defendant must have sufficient 'minimum contacts' with the forum such that the lawsuit does not offend 'traditional notions of fair play and substantial justice.'" *In re SSA Bonds*, 420 F. Supp. 3d at 234–35 (citations omitted). "The due process inquiry requires courts to evaluate the 'quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test.'" *Id.* at 235 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). Here, the totality of the circumstances shows that WCI and WCUSI have no direct contacts with this district, and their relationship with County Waste and Robert Wright is either one of mere ownership (WCI) or an administrative relationship (WCUSI) that does not create jurisdictional contacts. "There is no factual support for the proposition that" WCI or WCUSI "directed any actions at New York specifically." *In re SSA Bonds*, 420 F. Supp. 3d at 235. Exercising personal jurisdiction over those entities would offend due process.

4847-7977-1887.3

## VIII. CONCLUSION

For the foregoing reasons, the Court should:

- Dismiss the AC as to all defendants for failure to state a claim (Rule 12(b)(6)); and

- Dismiss the AC as to WCI and WCUSI for lack of personal jurisdiction (Rule 12(b)(2)).

Respectfully submitted,

Dated: June 18, 2021

NIXON PEABODY LLP

_____
            /s/ *William E. Reynolds*
William E. Reynolds (Bar No. 512175)
Gordon L. Lang (Bar No. 509321)
Andrew C. Rose (Bar No. 102473)
Erin T. Huntington (Bar No. 702540)
677 Broadway, 10th Floor
Albany, NY 12207
Tel: (518) 427-2687
Fax: (855) 897-1993
wreynolds@nixonpeabody.com
glang@nixonpeabody.com
acrose@nixonpeabody.com
ehuntington@nixonpeabody.com

*Attorneys for Defendants*

4847-7977-1887.3