UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
TWIN BRIDGES WASTE AND
RECYCLING, LLC,

                Plaintiff,

    -v-                           1:21-CV-263

COUNTY WASTE AND RECYCLING
SERVICE, INC.; ROBERT WRIGHT
DISPOSAL, INC.; WASTE
CONNECTIONS US, INC.; and
WASTE CONNECTIONS, INC., doing
business as Waste Connections,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                     OF COUNSEL:

DREYER BOYAJIAN LLP         DONALD W. BOYAJIAN, ESQ.
Attorneys for Plaintiff           JAMES R. PELUSO, JR. ESQ.
75 Columbia Street             LAUREN S. OWENS, ESQ.
Albany, New York 12210        WILLIAM J. DREYER, ESQ.

NIXON, PEABODY LAW FIRM    ANDREW C. ROSE, ESQ.
   ALBANY OFFICE              WILLIAM E. REYNOLDS, ESQ.
Attorneys for Defendants       ERIN HUNTINGTON, ESQ.
677 Broadway Tenth Floor
Albany, New York 12207

NIXON, PEABODY LAW FIRM    GORDON L. LANG, ESQ.
   D.C. OFFICE
Attorneys for Defendants
799 Ninth Street, Northwest, Suite 500
Washington, District of Colombia 20001

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On May 28, 2021, plaintiff Twin Bridges Waste and Recycling, LLC ("Twin Bridges" or "plaintiff") filed a 387-paragraph, 79-page amended complaint. It included 57 pages and 334 paragraphs of alleged facts. Plaintiff alleges antitrust violations against defendant waste disposal companies County Waste and Recycling Service, Inc. ("County Waste") and Robert Wright Disposal, Inc. ("Robert Wright"), both of which are allegedly indirect subsidiaries of defendants Waste Connections US, Inc. ("WCUSI") and Waste Connections, Inc. ("WCI" and collectively "defendants").

More specifically, Twin Bridges claims that defendants are trying to freeze it (and everyone else) out of the market for waste disposal services in New York's Capital Region (the "Capital Region Market"). Plaintiff alleges that defendants are attacking that objective through a multifaceted strategy of price-gouging, locking customers into nearly inescapable long-term contracts, impugning competitors' integrity, and consolidating control over landfills to exclude other waste companies.

On June 18, 2021, defendants moved to dismiss Twin Bridges' amended complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. Those motions,

having been fully briefed, will now be decided on the submissions and without oral argument.

## II. **BACKGROUND**

In some senses, Twin Bridges' amended complaint (Dkt. 21, "Compl.") can be read as an ongoing feud between two waste disposal companies: plaintiff on the one hand and defendant County Waste on the other.  But in other ways, the conflict is more complicated than that, especially considering plaintiff's allegations that the larger corporate defendants are responsible for directing County Waste's efforts.  As a result, deciding defendants' present motion involves three steps.  First, sorting out each party's role in this litigation and their relationships to each other.  Second, deciphering what bad acts plaintiff alleges against each defendant.  And third, seeing if those alleged bad acts can support claims under federal antitrust law.

To that end, it makes the most sense to start with Twin Bridges' main alleged rivals, defendants County Waste and Robert Wright.  County Waste is a New York limited liability company with a principal place of business in Texas.[1]  Dkt. 21 Compl. ¶ 14.  But County Waste also does business more

---

[1] To the extent defendants' motion comes under Rule 12(b)(6), the facts are taken from plaintiff's amended complaint, as well as any documents attached to it or incorporated by reference, and read in the light most favorable to it.  To the extent defendants' motion comes under Rule 12(b)(2), however, some facts may be considered from beyond the four corners of the complaint.

locally under a number of other names, including Ace Carting, D.J.'s Roll Off Service, Hardesty and Sons Sanitation, and others.  *Id.* ¶ 15.

Robert Wright is also a New York limited liability company, but unlike County Waste its principal place of business is in the County of Albany, New York.  Compl. ¶ 16.  Robert Wright is a wholly-owned subsidiary of County Waste.  *Id.* ¶¶ 22, 30.

One step up from County Waste is WCUSI.  Though there are precious few allegations against this defendant, Twin Bridges at least alleges that WCUSI is a Delaware corporation with a principal place of business in Texas. Compl. ¶ 17.  Otherwise, plaintiff only alleges that WCUSI "transact[s] substantial business within New York State[.]"  *Id.* ¶ 29.

Finally, defendant WCI is a Canadian corporation, although it apparently also operates out of Texas.  Compl. ¶ 18.  WCI describes itself as "the third-largest waste management company" in North America, at least as far as revenue is concerned.  *Id.* ¶ 26.  Twin Bridges alleges that WCI prioritizes "exclusive and secondary markets" across the United States and Canada." *Id.* ¶ 25.  To that end, plaintiff claims that WCI avoids larger, more competitive urban markets and instead targets "markets where [it] can attain high market share[,] either through exclusive contracts, vertical integration[,] or asset positioning."  *Id.* ¶ 74.

One method of vertical integration that WCI occasionally employs is landfill ownership.  WASTE CONNECTIONS, *2019 Annual Report* ("Annual Report"), p. 11[2] (2019) http://online.fliphtml5.com/jvcm/ycal/#p=1 (last visited Sept. 13, 2021).  In its own words, WCI "generally own[s] landfills to achieve vertical integration in markets where the economic and regulatory environments make landfill ownership attractive."  *Id*. at 14.  Plaintiff alleges that defendants own nine landfills in the Capital Region through nine different subsidiaries.  Compl. ¶ 33.  In its 2019 Annual Report, WCI nevertheless repeatedly refers to the landfills as "our" landfills that "we own[ ] or operate[.]"  Annual Report p. 14.

Ultimately, Twin Bridges alleges that defendants collectively "market their services and operate as [a] single integrated business entity known as 'Waste Connections.'"  Compl. ¶ 39.  According to defendants, though, the relationship between them involves a fair sight more distance than plaintiff suggests.  WCI claims that it "owns a subsidiary that owns another subsidiary that owns another subsidiary that owns another subsidiary that owns WCUSI."  Dkt. 22-2 ("Pio Aff."), ¶ 8.  From there, WCUSI owns yet another subsidiary, that in turn owns County Waste.  *Id*. ¶ 9.  And of course, County Waste then owns Robert Wright.  *Id*. ¶ 22.

---

[2] Pagination refers to the overall page number, not the page numbers the document gives itself. Because the amended complaint specifically refers to WCI's 2019 annual report, the Court may rely on it in resolving defendants' personal jurisdiction and failure to state a claim arguments.

WCI describes its management of its subsidiaries as "decentralized." Annual Report p. 47.  Under that management strategy, "[l]ocal managers have the authority to make many decisions concerning their operations without obtaining prior approval from executive officers, subject to compliance with general company-wide policies."  *Id.*

Defendants were operating along those lines when Twin Bridges burst onto the Capital Region waste disposal scene in 2019.  Compl. ¶ 81.  Plaintiff describes itself as a "local" disposal and recycling company stationed out of the Town of Halfmoon in the Capital Region of New York.  Compl. ¶¶ 1, 7. Fledgling as it is—and as a contrast to defendants' well-oiled corporate machinery—plaintiff alleges that it owns no landfills.  *Id.* ¶ 8.

Nevertheless, Twin Bridges set its sights on making a name for itself in the Capital Region Market.  In plaintiff's own words, that market is "the provision [of] Waste Services to residential, commercial[,] and governmental customers within the Capital Region counties of Albany, Fulton, Rensselaer, Saratoga, Washington[,] and Warren."  Compl. ¶ 101.  The market also includes commercial—but not residential—customers in Schenectady County, because plaintiff does not serve residential customers in that county.  *Id.* ¶¶ 102-03.

According to Twin Bridges, breaking into the Capital Region Market was daunting from the jump.  As plaintiff would have it, County Waste and

Robert Wright together enjoyed a market share of "well over fifty percent of the residential subscription-based customers in the Capital Region Market." Compl. ¶ 78.  In fact, plaintiff alleges that Robert Wright had a complete monopoly in southern Albany County.  *Id.* ¶ 79.

In 2019, Twin Bridges claims that County Waste and Robert Wright's market power was such that plaintiff emerged as the "only alternative" for "most residential customers."  Compl. ¶ 80.  According to plaintiff's narrative, its arrival in the Capital Region Market immediately led to monopolistic gambits by defendants.  *Id.* ¶ 81.

Those alleged gambits come in three flavors.  First, under Count I, Twin Bridges alleges that defendants cut their prices below their costs to starve plaintiff out of the market.  *See* Compl. ¶ 83.  Specifically, plaintiff claims that County Waste slashed its prices from between $41 and $43 per month in 2011 to between $26 and $32 per month once plaintiff and its predecessor attempted to enter the market.  *Id.* ¶¶ 112, 114.

That effort would prove to be only the first salvo in a price-cutting war between County Waste on the one side and Twin Bridges and its predecessor on the other.  *See* Compl. ¶¶ 115-28.  Plaintiff provides a number of alleged examples.  Recently, plaintiff alleges that County Waste offered new residential customers twelve months of free service followed by two years of service at $12 per month.  *See id.* ¶¶ 127-28.  That rate amounts to only $8

7

per month for the first thirty-six months of service, which, according to plaintiff, is significantly below the $15-27 per month County Waste would need to charge to recoup its average variable costs. *See id.* ¶¶ 128, 131.

Twin Bridges alleges similarly drastic pricing offers in other spheres as well. Plaintiff alleges that Robert Wright and County Waste have offered deals equivalent to: (1) $1.67 per month for the first thirty-six months of contracts with homeowners' associations; (2) $8.95 for the Village of Nassau; and (3) $5.03 per month for the City of Gloversville, not to mention several other similarly drastic price cuts. Compl. ¶¶ 147, 162, 164, 173-213. Plaintiff alleges that each of these offers falls below the minimum defendants need to collect to break even on these contracts. *Id.* ¶¶ 148, 162, 166, 180, 189, 196.

Second, under Count II, plaintiff brings a kind of catchall claim of other anticompetitive conduct. *See* Compl. ¶ 83. Specifically, plaintiff points to an ongoing campaign to defame plaintiff's owner, including a County Waste memorandum maligning the relative size of plaintiff and declaring that County Waste will "win the war" against plaintiff and its owner. *Id.* ¶ 96. Plaintiff also alleges that when defendants absorbed Robert Wright, they kept its former owner on board because he claimed that he could "control" plaintiff's owner. *Id.* ¶¶ 224-25.

Twin Bridges further claims that defendants have locked their residential customers into contracts that renew automatically unless the customer

8

provides written notice of his or her intent to end service well in advance of the deadline.  Compl. ¶ 226.  Those contracts also include rights of first refusal, which allow defendants to match the price offer of any competitor. *Id.*

Effectively, Twin Bridges claims that these policies keep customers trapped in contracts with defendants, because defendants could simply match any competitor's price to prevent an exodus to other disposal companies.  *Id.* ¶ 229.  Plaintiff also alleges that defendants are engaging in a widespread and ongoing effort to poach any customers plaintiff manages to bring on board by offering them special deals including drastic price cuts.  *See id.* ¶¶ 243-249.

As a further example of allegedly anticompetitive conduct, Twin Bridges points to a number of alleged examples of defendants smearing plaintiff's reputation while working to keep their own customers in the dark as to defendants' contractual terms.  *See* Compl. ¶¶ 252-85.  Of particular weight, plaintiff claims that defendants published a letter on social media falsely accusing plaintiff's owner of being investigated by the Department of Justice for wire fraud.  *Id.* ¶¶ 307-323.

Third, under Count III, Twin Bridges claims that defendants denied it access to their landfills to drive up plaintiff's costs.  *See* Compl. ¶ 83. According to plaintiff, defendants have a "controlling market share in the

ownership and operation of transfer stations and landfills in the Capital Region Market." Compl. ¶ 289. What is more, plaintiff claims that defendants spoke to other waste haulers and landfill owners to discourage them from working with—or even speaking positively of—plaintiff. *Id.* ¶¶ 303-04

Despite Twin Bridges' ranging allegations of misconduct, it was defendants who cast the first stone. Apparently fed up with their ongoing battles for the Capital Region Market, County Waste and Robert Wright brought a lawsuit against plaintiff in New York Supreme Court, Albany County. Compl. ¶ 334. Plaintiff responded by filing antitrust counterclaims not unlike the ones before this Court. *See id.* Upon realizing that federal courts have exclusive jurisdiction of federal antitrust law, plaintiff voluntarily withdrew those claims without prejudice. *Id.*

Twin Bridges promptly refiled its antitrust claims against defendants before this Court on March 8, 2021. Dkt. 1. On May 7, 2021, defendants moved to dismiss plaintiff's complaint under Rule 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim, respectively. Dkt. 22. This decision now follows.

## III. **LEGAL STANDARDS**

### A. **Rule 12(b)(6) Failure to State a Claim**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  That factual matter may be drawn from "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Importantly, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  If the complaint and its additional materials—when viewed through that pro-plaintiff lens—are not enough to raise the plaintiff's right to relief on a claim above the speculative level, that claim must be dismissed. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### B. Rule 12(b)(2) Lack of Personal Jurisdiction

If a defendant calls personal jurisdiction into question under Rule 12(b)(2), the burden of establishing jurisdiction falls to the plaintiff. *Nat'l Elec. Sys., Inc. v. City of Anderson*, 601 F. Supp. 2d 495, 497 (N.D.N.Y. 2009) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  To carry that burden, the plaintiff must "allege facts

constituting a prima facie showing of personal jurisdiction." *Nat'l Elec. Sys.*, 601 F. Supp. 2d at 497 (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1106 (2d Cir.1997)).

At this early stage, all pleadings and factual ambiguities are construed in the plaintiff's favor.  *Nat'l Elec. Sys.*, 601 F. Supp. 2d at 497 (citing *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994)).

However, the same is not true of argumentative inferences, nor will the court "accept as true a legal conclusion couched as a factual allegation[.]"  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal citations and quotation marks omitted).  Moreover, on a motion to dismiss under Rule 12(b)(2), courts may consider materials outside the pleadings "without converting [the] motion . . . into a motion for summary judgment."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).

From that factual footing, a court must determine whether the plaintiff has made "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (cleaned up).

## IV. <u>DISCUSSION</u>

Defendants' arguments for dismissal have three levels of scale.  First, defendants raise one case-wide argument for dismissal: that Twin Bridges has failed to sufficiently allege that there is a substantial enough risk of defendants achieving a monopoly.  Second, defendants raise three claim-based arguments, each of which would dispose of a claim as to all defendants, but can only dispose of the case altogether if defendants are correct on all three points.  Third, defendants argue that this Court lacks personal jurisdiction over WCI and WCUSI, which would only dismiss those defendants from the case.  To avoid unnecessary duplication of effort, the Court will consider defendants' arguments from broadest to narrowest, only reaching the jurisdictional arguments if any of plaintiff's claims remain viable.

## A. Probability of Achieving a Monopoly

Defendants begin their assault on Twin Bridges' complaint by arguing that plaintiff has failed to adequately allege that they possess monopoly power.  "To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in [(1)] predatory or anticompetitive conduct, [(2)] with a specific intent to monopolize a particular and defined market, and [(3)] a dangerous probability of success." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 381 (S.D.N.Y. 2016) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

The third element of a dangerous probability of success requires courts to "consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.  In other words, "a defendant's market share is the primary indicator of the existence of a dangerous probability of success." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (internal citations and quotation marks omitted).

But "primary" does not mean "only."  On the contrary, other barriers to entry have their say as well.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998).  For example, even an alleged market share north of 70% does not conclusively establish monopoly power if there is evidence of a lack of barriers to entry.  *Id.* (holding that high market share is not dispositive of monopoly power in upholding grant of summary judgment).  By contrast, a market share greater than 50% accompanied by evidence of other barriers to entry can establish monopolization.  *See id.*  And in either case, a claim of attempted monopolization can be supported by a showing of lesser power than is required to establish a claim of completed monopolization.  *Id.* at 100.

As the varied factors at play in the monopoly power calculation should make clear, "[t]he existence of monopoly power, or the dangerous probability of acquiring it, is heavily fact-dependent." *In re Payment Card Interchange*

*Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008).  As a result, "courts rarely grant dismissal of [attempted monopolization claims] on the basis of insufficient market share, unless the plaintiff rests its claims on market share allegations to the exclusion of other evidence."  *Id.* (collecting cases).

Upon review, Twin Bridges' showing of defendants' market power is not so feeble or contradicted as to justify dismissal.  Remember, plaintiff alleges that defendants held a market share of "well over fifty percent of the residential subscription-based customers in the Capital Region Market." Compl. ¶ 78.  Although defendants correctly point out that this figure does not account for commercial or government customers, plaintiffs have nevertheless still alleged that defendants have a "leading market position" in the Capital Region Market as defined by the amended complaint.  *Id.* ¶¶ 9, 28, 32, 346.

In addition, Twin Bridges has alleged that defendants have assumed control over landfills in the Capital Region Market to vertically integrate and construct additional barriers to entry.  *See* Annual Report p. 11.  Between defendants' market power and their other barriers to entry, plaintiff has alleged that customers are frequently faced with no alternatives to defendants.  *See* Compl. ¶ 77.  At this early stage, these allegations of

15

substantial market power and barriers to entry are enough to carry plaintiff's burden. Defendants' motion to dismiss on this score must be denied.

## B. <u>Predatory Pricing</u>

Next, defendants argue that Twin Bridges has failed to properly plead the requisite element of anticompetitive conduct for its Count I predatory pricing claim. To that end, "[p]redatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117 (1986).

Ultimately, predatory pricing claims look like this. The seller starts by cutting its prices to levels that its competitors, actual or prospective, cannot match. *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir. 1992). Would-be competitors find themselves forced to drop out of the market, which allows the seller to build or maintain a monopoly. *Id.* Then, once the seller has secured its power, it takes advantage of consumers' lack of alternatives by charging high prices to recoup the losses from its earlier, lower prices. *Id.*

Alleging such a long-term scheme is no meager feat. Eventually, a predatory pricing plaintiff "must prove that prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had

a . . . dangerous probability [ ] of recouping its investment in below-cost prices." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

Of course, low prices are more often a sign of healthy competition than of the predatory sort. *See Id.* at 226-227. As a consequence, and to prevent inadvertently chilling appropriate competition, predatory pricing claims are difficult to plead and prove. *Id.*

Even so, Twin Bridges has once again cleared the modest hurdle of plausibility required of a Rule 12(b)(6) motion. Plaintiff has alleged that defendants have cut their prices well below their average variable cost for several groups of customers. *See* Compl. ¶¶ 127-28, 131, 147-48, 162, 164, 166, 173-213. Plaintiff has also alleged that defendants lock their customers into contracts that are nearly impossible to escape. Compl. ¶¶ 226, 229.

Between those two alleged facts, Twin Bridges has plausibly established that defendants are cutting costs below the levels necessary to make a short-term profit, while locking customers into long-term contracts to take advantage of them later. Once again, defendants' motion to dismiss misses the mark, and plaintiff's Count I attempted monopoly claim relying on predatory pricing must survive that motion.

C. **Anticompetitive Conduct**

Defendants also argue that Twin Bridges' Count II general anticompetitive conduct claim cannot pass muster.  "[A]nticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition."  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal citations and quotation marks omitted).  That definition is a narrow one, which works to ensure that exceptions to the general rule that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing" are "rare."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

As discussed above, Twin Bridges' claims of anticompetitive conduct cash out to claims that defendants improperly lock customers into long-term contracts to prevent them from signing with competitors, all while attacking those competitors with unfounded allegations.  To defendants' mind, these facts are not enough to carry water.

As for the first theory, defendants argue that Twin Bridges has failed to adequately allege that defendants' exclusive contracts with their customers have foreclosed competition in a substantial share of the Capital Region Market.  *See Maxon Hyundai Mazda v. Carfax, Inc.*, 726 F. App'x 66, 70 (2d Cir. 2018) (summary order) (affirming grant of summary judgment for

failure to prove substantial foreclosure of competition in applicable market in exclusive contracts case).

As Twin Bridges correctly notes, though, defendants are asking for far too much from it at the motion to dismiss stage.  Plaintiff has alleged that defendants have substantial control over the Capital Region Market for waste disposal and are using that control to lock customers into exclusive contracts.  Compl. ¶¶ 77, 226, 229.

Although plaintiff will likely have to establish substantial foreclosure of the market down the road,[3] at present there is no need to require plaintiff to allege anything more concrete than that.  *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 237 (S.D.N.Y. 2019) ("At the motion to dismiss stage, . . . specific mathematical pleading is unnecessary.").  To the extent it relies on exclusive contracts, Count II must survive.[4]  *See, e.g.*, *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 642 (E.D.N.Y. 2009) (allowing claims of overly restrictive contracts in waste disposal to survive motion under Rule 12(b)(6)).

---

[3] Unless plaintiff can establish that defendants' contracts are "so plainly anti-competitive and so lacking in redeeming pro-competitive value that [they are] presumed illegal without further examination," plaintiff will have to clear the rule of reason test.  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).  Under that test, plaintiff would be required to establish an "actual adverse effect on competition as a whole in the relevant market."  *Id.*

[4] Because Count II survives as a whole, the Court need not delve into whether plaintiff's alternate theories of recovery under this count have merit at this juncture.

19

### D. **Refusal of Access**

Defendants also set their sights on Count III of Twin Bridges' complaint, alleging anticompetitive refusal of access to defendants' landfills. "As a general rule, businesses are free to choose the parties with whom they will deal[.]" *Pac. Bell*, 555 U.S. at 448. In some "limited circumstances," though, a firm's "unilateral refusal to deal with its rivals can give rise to antitrust liability." *Id.*

But the Supreme Court has been "very cautious" in giving their blessing to circumstances overpowering the freedom to deal. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP* ("*Trinko*"), 540 U.S. 398, 408 (2004). The one exception that the Supreme Court has recognized is "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing" with a competitor. *Id.* at 409. If a firm is willing to break a presumably profitable agreement, the logic goes, a jury could reasonably determine that the purpose in breaking that agreement was to forgo profit in the short term to achieve the long-term goal of weakening a competitor. *Id.*

Much less certain is Twin Bridges' submitted "essential facility" exception. The essential facility test as laid out by the Eleventh Circuit states that "a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain

monopoly power in the relevant market." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).

There are two grave problems with Twin Bridges' reliance on the essential facility exception.  First, neither the Supreme Court nor the Second Circuit have ever accepted that theory.  *Trinko*, 540 U.S. at 411; *see RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d Cir. 2010) (summary order) (dismissing claim relying on essential facility exception "to the extent that such a claim is viable").  Instead, the only exception recognized by the Second Circuit to the "broad right of a firm to refuse to deal with its competitors" is a monopolist's termination of "a prior (voluntary) course of dealing with a competitor."[5]  *In re Adderall*, 754 F.3d at 134.

Second, even if there an authority binding on this Court that recognized the essential facility exception, that exception contains an "indispensable requirement" that there be "unavailability of access to the essential facilities."  *Trinko*, 540 U.S. at 441 (cleaned up).  "[W]here access exists, the doctrine serves no purpose."  *Id.*  In other words, where the plaintiff alleges only "inconvenience, or even some economic loss," an essential facilities claim must fail.  *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570

---

[5] To the extent that plaintiff relies on an "intent" theory also recognized by the Eleventh Circuit, the Second Circuit has never acknowledged that theory, either.  *Compare Morris*, 364 F.3d at 1294 (Eleventh Circuit describing "intent theory" of monopolization), *with In re Adderall*, 754 F.3d at 134 (recognizing termination of prior course of dealing as "sole exception" to right to refuse to deal with competitor).

(2d Cir. 1990).  Instead, the plaintiff must allege "that an alternative to the facility is not feasible."  *Id.*

Twin Bridges' refusal to deal claim cannot pass muster.  Even if the Court were to take the bold step of applying the essential facility doctrine, plaintiff has failed to adequately plead an essential facility claim.

After all, Twin Bridges claims that it "routinely disposes of waste and recyclables collected in the Capital Region Market at disposal facilities located outside of New York State, including at facilities located in Pennsylvania."  Compl. ¶ 327.  That long haul is an inconvenience, to be sure, and likely involves some economic loss.  But it is a feasible alternative nevertheless.  *Twin Labs*, 900 F.2d at 570.  Accordingly, even if the essential facility doctrine were available to plaintiff, its complaint would not present a claim under that doctrine's auspices.  *See id.* (noting that plaintiff must allege absence of feasible alternative to sustain hypothetical essential facility claim).

Twin Bridges also fails to allege that defendants previously permitted it to use their landfills before suddenly reneging on that arrangement.  As a result, plaintiff cannot avail themselves of the only fully recognized exception to the general rule of freedom to deal.  *In re Adderall*, 754 F.3d at 134. Defendants' motion to dismiss Count III must be granted.

**E. Personal Jurisdiction over WCI and WCUSI**

At this point, Counts I and II remain active against all defendants. However, defendants argue that this Court lacks personal jurisdiction over WCI and WCUSI.  By extension, defendants still urge the Court to at least release those defendants from this case.

To that end, personal jurisdiction for an antitrust claim can be established under federal or state law.  But in either case, that jurisdiction must comport with the due process guarantees of the Fourteenth Amendment.  Under federal law, the venue provision of the Clayton Act ("§ 22") provides personal jurisdiction over a defendant in an antitrust case "wherever [the defendant] may be found."  15 U.S.C. § 22.  That provision allows nationwide service of process against a defendant, but only if the provision's venue provision is met.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 424-25 (2d Cir. 2005).

Section 22 establishes venue over an antitrust defendant both: (1) "in the judicial district whereof it is an inhabitant"; and (2) "in any district wherein it may be found or transacts business."  15 U.S.C. § 22.  "Transacting business" is sustained by the "practical, everyday business or commercial concept of doing or carrying on busines of any substantial character."  *Daniel*, 428 F.3d at 428.  The nature of a corporate defendant's business is ultimately essential to the inquiry.  *All Star Carts*, 596 F. Supp. 2d at 637.  "A

parent-subsidiary relationship may form a basis for the exercise of Clayton Act jurisdiction." *Id.*

Regarding defendant WCI, Twin Bridges has adequately established personal jurisdiction under § 22.  In arguing otherwise, defendants make much of the Canadian corporation's observance of corporate formalities and their extremely remote distance from the nitty-gritty conflicts between plaintiff, County Waste, and Robert Wright.  And indeed, their arguments are not without merit, particularly to the extent that defendants urge that WCI limits itself to larger issues and allows its subsidiaries to primarily govern themselves through their decentralized organization scheme.  Annual Report p. 47.

But WCI's treatment of landfills in this district is what ultimately convinces the Court of its jurisdiction over this defendant.  WCI frequently refers to the landfills as "ours."  *See, e.g.*, Annual Report pp. 14-18, 23, 27-28, 37, 39, 44, 56-57, 60.  That is no mere accident, because WCI specifically describes purchasing those landfills as a strategy to aid in vertical integration in markets where it would be advantageous.  *Id.* at 11.  What is more, plaintiff has alleged WCI's ownership of nine landfills in the Capital Region Market.  Compl. ¶ 33.

Defendants do not dispute any of those facts.  Instead, defendants point out that WCI itself does not own the landfills: its subsidiaries do.  *See*

24

Compl. ¶ 33.  That may be true, but the amended complaint alleges—and defendants do not meaningfully dispute—that WCI guides the overall strategy that dictates that those subsidiaries purchase landfills where it presents a market advantage.  *See id.*  After all, if WCI claims the landfills as its own and specifically outlines a strategy for when landfills should be purchased, it can hardly contend that it does not have a hand in purchasing them and thereby transacting business.  Annual Report pp. 11, 14-18, 23, 27-28, 37, 39, 44, 56-57, 60.

Accordingly, personal jurisdiction under § 22 is met for WCI.  Yet that does not answer whether the Due Process Clause also permits the Court's personal jurisdiction over the Canadian defendant.  To that end, there are two types of personal jurisdiction contemplated by the Due Process Clause: general and specific.

"For an individual, the paradigm forum for the exercise of general jurisdiction [comporting with due process] is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  *Bristol-Meyers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780 (2017).  "A corporation that operates in many places can scarcely be deemed at home in all of them."  *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014)).

Instead, the affiliations capable of supporting general jurisdiction "have the virtue of being unique—that is, each ordinarily indicates only one place— as well as easily ascertainable." *Sonera*, 750 F.3d at 225.

Nothing in Twin Bridges' complaint suggests that New York or its Northern District is fairly regarded as WCI's home. On the contrary, this defendant is a Canadian corporation operating out of Texas. Compl. ¶ 18. General personal jurisdiction over WCI can thus safely be ruled out.

But the specific jurisdiction inquiry tells a different story. That inquiry follows three steps. First, the plaintiff must demonstrate that the defendant has sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (citations and quotation marks omitted). It is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal citations and quotation marks omitted).

"Nor is it sufficient for a plaintiff to show simply that a defendant's actions caused an 'effect' in the forum state where the defendant has not expressly aimed its conduct at the forum." *U.S. Bank*, 916 F.3d at 151 (internal citations and quotation marks omitted). In a case involving the flow of

commerce into a state, "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where [it] can be said to have targeted the forum[.]" *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011).

If a plaintiff makes that showing, the second step tasks it with demonstrating that "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *In re Terrorist Attacks*, 714 F.3d at 674 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Finally, for the third step, the Court "considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *U.S. Bank*, 916 F.3d at 151 (internal citations and quotation marks omitted).  For specific jurisdiction, those factors are:  (1) the defendant's burden; (2) the interests of the forum State; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in efficient resolution; and (5) public policy. *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987).

The first step of the personal jurisdiction inquiry carries over neatly from the Clayton Act analysis.  Twin Bridges has alleged that WCI strategically directed its subsidiaries to consolidate ownership of landfills in the Capital Region Market, which involves a deliberate decision to conduct business in New York.  Annual Report pp. 11, 14-18, 23, 27-28, 37, 39, 44, 56-57, 60.

The second step is similarly straightforward.  Twin Bridges has alleged that WCI purchased those landfills to advance a competitive advantage through vertical integration.  Compl. ¶ 74; Annual Report p. 11.  By plaintiff's logic, WCI is trying to consolidate monopoly power for its local offshoots. Accordingly, because WCI's conduct is directly related to an element of plaintiff's claims against defendants, plaintiff's injuries attributable to that monopoly power "arise from" WCI's landfill ownership.  *In re Terrorist Attacks*, 714 F.3d at 674.

As for the third step, the Court is satisfied that New York's interests in preventing monopolies in its back yard and plaintiff's ability to obtain injunctive relief in the district where the alleged harm is taking place outweigh any burden WCI might face.  *Asahi*, 480 U.S. at 113.  In fact, WCI's burden is especially minimal because WCI's subsidiaries will need to be defended in any case.

In short, all three steps of specific personal jurisdiction under the Due Process Clause are met.  Defendants' motion to dismiss Twin Bridges' complaint under Rule 12(b)(2) must be denied as to WCI, at least at this juncture.  *See, e.g.*, *All Star Carts*, 596 F. Supp. 2d at 638-39 (denying motion to dismiss on personal jurisdiction grounds for owner of subsidiary garbage companies because of broad scope of personal jurisdiction under § 22).

The outlook is not quite so bright for Twin Bridges' claims against WCUSI, however.  Plaintiff offers precious few allegations unique to this defendant.  On the contrary, most of the complaint simply lumps WCUSI together with the other defendants.  *See, e.g.*, Compl. ¶ 30 (noting that most of complaint will collectively refer to defendants as "Waste Connections").  Otherwise, plaintiff only offers the conclusory allegation that WCUSI "transact[s] substantial business within New York State[.]"  *Id.* ¶ 29.

By contrast, defendants have submitted an affidavit that disavows any operational functions by WCUSI relevant to the present complaint.  Pio Aff. ¶¶ 15-20.  Similarly, that affidavit insists that there are no WCUSI employees in New York State at present.  *Id.* ¶ 32.

For its part, Twin Bridges objects that this affidavit is self-serving and should be rejected.  But even if the Court were to take plaintiff up on that invitation, the complaint simply provides no allegations tying WCUSI to any conduct it complains of.  Even assuming that plaintiff could somehow establish personal jurisdiction through § 22 or New York's long-arm statute[6] on these barebones facts, the lack of any link between any conduct in the complaint attributable to WCUSI and the harms plaintiff complains of would

---

[6] If a plaintiff cannot meet § 22's venue requirements, the plaintiff must establish personal jurisdiction through state law.  *See Daniel*, 428 F.3d at 427 (noting that plaintiff failing to meet venue requirements of § 22 "must look to other service of process provisions, notably those specified in [Rule] 4 or incorporated therein from state law to satisfy this requirement").

prove fatal to the second step of the Due Process analysis.  *In re Terrorist Attacks*, 714 F.3d at 674 (requiring harm plaintiff complains of to arise from contacts with forum state).

Accordingly, Twin Bridges has failed to satisfy its burden of proving personal jurisdiction over WCUSI.  Defendants' motion to dismiss under Rule 12(b)(2) must be granted on that score, and WCUSI must be dismissed from this case.

## V. <u>CONCLUSION</u>

Despite defendants' best efforts, Twin Bridges' antitrust claims remain largely intact in the aftermath of their motion to dismiss.  Even so, that motion has nevertheless allowed the Court to streamline the issues—and defendants—in this case going forward.  Counts I and II against defendants County Waste, Robert Wright, and WCI may proceed.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss under Rule 12(b)(2) and 12(b)(6) is GRANTED in part and DENIED in part;

2. Count III for attempt to monopolize for a refusal of access to disposal facilities is DISMISSED;

3. Defendant Waste Connections U.S., Inc. (WCUSI) is DISMISSED;

4. Plaintiff Twin Bridges Waste and Recycling, LLC's claims under Counts: (I) attempt to monopolize through predatory pricing; and (II) attempt to monopolize through anticompetitive conduct remain against defendants County Waste and Recycling Service, Inc., Robert Wright Disposal, Inc., and Waste Connections, Inc.; and

5. The remaining defendants are directed to answer Counts I and II of plaintiff Twin Bridges Waste and Recycling, LLC's amended complaint no later than Tuesday, September 28, 2021.

IT IS SO ORDERED.


Dated:  September 14, 2021
        Utica, New York.

David N. Hurd
U.S. District Judge